PRISONER'S CIVIL RIGHTS COMPLAINT (Rev. 05/2015)

**FILED**

July 13, 2022

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY: _____CV_____
DEPUTY

# IN THE UNITED STATES DISTRICT COURT
## FOR THE ___WESTERN___ DISTRICT OF TEXAS
### ___WACO___ DIVISION

___KRISTOFER MARSH, TDCJ No. 1107881___
Plaintiff's Name and ID Number
    HUGHES UNIT (TDCJ-CID)
    3201 FM 929, GATESVILLE, TX  76597

Place of Confinement

CASE NO.___6:22-cv-00292___
(Clerk will assign the number)

v.  DR. LANNETTE C. LINTHICUM, M.D.,
    Director, TDCJ-Health Services Division,
    2 Financial Plaza, Suite 625
    Huntsville, TX 77340
Defendant's Name and Address
    Dr. Rooney Burrow, M.D., Chair
    Texas Board Criminal Justice - Health Care Committee
Defendant's Name and Address P.O. Box 13084  , Austin, TX
    Patrick L. O'Daniel, Chairman TBCJ,
    Memeber TBCJ - Health Care Committee
Defendant's Name and Address  P.O. Box 13084  , Austin, TX
( DO NOT USE "ET AL.")

(MORE DEFENDANTS ON ATTACHED PAGE)

## INSTRUCTIONS - READ CAREFULLY
### ***AMENDED PRO SE § 1983 COMPLAINT ***

**NOTICE:**

**Your complaint is subject to dismissal unless it conforms to these instructions and this form.**

1.  To start an action you must file an original and one copy of your complaint with the court. You should keep a copy of the complaint for your own records.

2.  Your complaint must be legibly handwritten, in ink, or typewritten. You, the plaintiff, must sign and declare under penalty of perjury that the facts are correct. If you need additional space, **DO NOT USE THE REVERSE SIDE OR BACKSIDE OF ANY PAGE.** ATTACH AN ADDITIONAL BLANK PAGE AND WRITE ON IT.

3.  You must file a separate complaint for each claim you have unless the various claims are all related to the same incident or issue or are all against the same defendant, Rule 18, Federal Rules of Civil Procedure. Make a short and plain statement of your claim, Rule 8, Federal Rules of Civil Procedure.

4.  When these forms are completed, mail the original and one copy to the clerk of the United States district court for the appropriate district of Texas in the division where one or more named defendants are located, or where the incident giving rise to your claim for relief occurred. If you are confined in the Texas Department of Criminal Justice, Correctional Institutions Division (TDCJ-CID) , the list labeled as "VENUE LIST" is posted in your unit law library. It is a list of the Texas prison units indicating the appropriate district court, the division and an address list of the divisional clerks.

Rev. 05/15

(CASE CAPTION / STYLE CONTINUED)

DERRELYNN PERRYMAN, MEMBER
TBCJ - HEALTH CARE COMMITTEE
P.O. Box 13084     , Austin, TX  78711

E.F. "MANO" DeAYALA, J.D., MEMBER
TBCJ - HEALTH CARE COMMITTE
P.O. Box 13084, Austin ,TX  78711

Bryan Collier, Executive Director
Texas Department of Criminal Justice
1209 W. 14th St., 5th Floor, Austin TX  78701

Bobby Lumpkin, Director,
TDCJ-Correctional Institutions Division
P.O. Box 99
Hutsville, TX  77342-0099

Dr. Manuel Hirsch, D.D.S., Dental Director,
TDCJ- Health Services Division
2 Financial Plaza, Suite 625, Huntsville, TX  77340

Dr. Owen Murray, D.O., Vice President UTMB-CMHC
Executive Clinical Services / Medical Director
301 University Blvd., Galveston, TX  77555-1206

Dr. Monte Smith, D.O., Chief Medcial Officer
University of Texas Medcial Branch - Correctional Managed Health Care
301 University Blvd., Galveston, TX  77555-1206

Dr. Billy E. Horton, D.D.S., Dental Director,
UTMB-CMHC
301 University Blvd., Galveston, TX  77555-1206

Dr. Denise DeShields, M.D., Executive Medcial Director
Texas Tech University Health Sciences Center - Correctional Managed
Health Care
ADDRESS UNKNOWN

Dr. John Doe, D.D.S., Dental Director TTUHSC-CMHC
NAME UNKNOWN
ADDRESS UNKNOWN

Theodore Nasiotis, PA, Provider
UTMB-CMHC Hughes Unit
3201 FM 929, Gatesville, TX  76597

Dr. Kristen A. Hurley, D.D.S., Unit Level Dentist
UTMB-CMHC Hughes Unit
3201 FM 929, Gatesville, TX  76597

Dr. Randall D. Meyer, D.D.S., Unit Level Dentist
UTMB-CMHC Hughes Unit
3201 FM 929, Gatyesville, TX  76597

Ter: Smith, R.M., C.N.M,
UTMB-CMHC Hughes Unit
3201 FM 929, Gatesville, TX  76597     1B

**FILING FEE AND *IN FORMA PAUPERIS* (IFP)**

1.  In order for your complaint to be filed, it must be accompanied by the statutory filing fee of $350.00 plus an administrative fee of $50.00 for a total fee of **$400.00**.

2.  If you do not have the necessary funds to pay the fee in full at this time, you may request permission to proceed *in forma pauperis.* In this event you must complete the application to proceed *in forma pauperis*, setting forth information to establish your inability to prepay the fees and costs or give security therefor. You must also include a current six-month history of your inmate trust account. If you are an inmate in TDCJ-CID, you can acquire the application to proceed *in forma pauperis* and the certificate of inmate trust account, also known as *in forma pauperis* data sheet, from the law library at you prison unit.

3.  The Prison Litigation Reform Act of 1995 (PLRA) provides "... if a prisoner brings a civil action or files an appeal *in forma pauperis,* the prisoner shall be required to pay the full amount of a filing fee."    *See* 28 U.S.C. § 1915. Thus, the court is required to  assess and, when funds exist, collect, the entire filing fee or a initial partial filing fee and monthly installments until the entire amount of the filing fee has been paid by the prisoner. If you submit the application to proceed *in forma pauperis*, the court will apply 28 U.S.C. § 1915 and, if appropriate, assess and collect the entire filing fee or an initial partial filing fee, then monthly installments from you inmate trust account, until the entire $350.00 statutory filing fee has been paid. (The $50.00 administrative fee does not apply to cases proceeding *in forma pauperis.)*

4.  If you intend to seek *in forma pauperis* status, do not send your complaint without an application to proceed *in forma pauperis* and the certificate of inmate trust account. Complete all essential paperwork before submitting it to the court.

**CHANGE OF ADDRESS**

It is your responsibility to inform the court of any change of address and its effective date. Such notice should be marked **"NOTICE TO THE COURT OF CHANGE OF ADDRESS"** and shall not include any motion for any other relief. Failure to file a NOTICE OF THE COURT OF CHANGE OF ADDRESS may result in the dismissal of your complaint pursuant to Rule 41(b), Federal Rules of Civil Procedure.

I.   PREVIOUS LAWSUITS:

    A.  Have you filed *any* other lawsuit in state or federal court relating to your imprisonment? ___ YES ✓ NO

    B.  If your answer to "A" is "yes", describe each lawsuit in the space below.  (If there is more than one lawsuit, describe  the additional lawsuits on another piece of paper, giving the same information.)

        1.  Approximate date of filing lawsuit: _____

        2.  Parties to previous lawsuit:

            Plaintiff(s) _____

            Defendant(s) _____

        3.  Court: (If federal, name the district; if state, name the county.) _____

        4.  Cause number: _____

        5.  Name of judge to whom case was assigned: _____

        6.  Disposition: (Was the case dismissed, appealed, still pending?) _____

        7.  Approximate date of disposition: _____

Rev. 05/15

II.  PLACE OF PRESENT CONFINEMENT: Hughes Unit (TDCJ-CID)
     3201 FM 929, Gatesville, TX  76597

III. EXHAUSTION OF GRIEVANCE PROCEDURES:

Have you exhausted all steps of the institutional grievance procedure?    ✓ YES ___NO

Attach a copy of your final step of the grievance procedure with the response supplied by the institution.

IV.  PARTIES TO THIS SUIT:

A. Name and address of plaintiff: Krisofer Marsh ,TDCJ No. 1107881, Hughes
   Unit (TDCJ-CID), 3201 FM 929, Gatesville, TX  76597

B. Full name of each defendant, his official position, his place of employment, and his full mailing address.
   (EACH DEFENDANT IN THEIR OFFICAL AND PERSONAL CAPCITY)

Defendant #1: Dr. Lannette C. Linthicum, M.D., Director of Texas
Department of Criminal Justice - Health Services Division,
2 Financial Plaza, Suite 625, Huntsville, TX  77340

Briefly describe the act(s) or omission(s) of this defendant which you claimed harmed you.
Developed, approved, recommended, enacted, and enforced the     (SAME FOR COVID)
unconstitutional CMHC Policy E-36.4 and denied STEP TWO grievances
which refused to provide dental prosthetic for extracted tooth.

Defendant #2: Dr. Rooney Burrow, M.D., Chair, Texas Board of Criminal
Justice, Health Care Committee, P.O. Box 13084 , Austin, TX

Briefly describe the acts(s) or omission(s) of this defendant which you claimed harmed you.
Approved, enacted ,and enforced the unconstituional CMHC Policy
E-36.4 necessary to deny a dental prosthetic for extracted tooth.

Defendant #3: Patrick L. O'Daniel, Chairman, Texas Board of Criminal
Justice (and member of TBCJ-Health Care Committee), P.O. Box
13084    , Austin TX

Briefly describe the acts(s) or omission(s) of this defendant which you claimed harmed you.
Approved, enacted, and enforced the unconstitutional CMHC Policy
E-36.4 necessary to deny a dental prosthethic for extracted tooth.

Defendant #4: Derrelynn Perryman, Member, TBCJ -Health Care Committee,
P.O. Box 13084    , Austin, TX

Briefly describe the act(s) or omission(s) of this defendant which you claimed harmed you.
Approved, enacted, and enforced the unconstitutional CMHC Policy
E-36.4 necessary to deny a dental prosthethic for extracted tooth.

Defendant #5: E.F. "Mano" DeAyala, J.D., Member, TBCJ - Health Care
Committee, P.O. Box 13084    , Austin, TX

Briefly describe the act(s) or omission(s) of this defendant which you claimed harmed you.
Approved, enacted, and enforced the unconstitutional CMHC Policy
E-36.4 necessary to deny a dental prosthetic for extracted tooth.

3/A

Defendant #6:  Bryan Collier, Executive Director, Texas Department of
    Criminal Justice, 1209 W. 14th St., 5th Floor ,Austin, TX 78701

Harmful Acts: Approved, recommended, enacted, and enforced the
    unconstitutional CMHC Policy E-36.4 necessary to  deny  dental
    prosthetic for extracted tooth. Same for COVID policy that
    unduely delayed dental treatment.
Defendant #7:  Bobby Lumpkin, Director, TDCJ - Correctional Institutions
    Division, P.O. Box 99, Huntsville, TX  77342-0099

Harmful Acts:  Approved, recommended, enacted, and enforced the
    unconstitutional CMHC Policy E-36.4 necessary to   deny  dental
    prosthetic for extracted tooth. Same for COVID policy that
    unduely delayed dental treatment.
Defendant #8:  Dr. Manuel Hirsch, D.D.S., Dental Director ,TDCJ-
    Health Services Division, 2 Financial Plaza ,Suite 625,
    Huntsville, TX  77340

Harmful Acts:  Developed, approved, recommended, enacted, and enforced
    the unconstitutional CMHC Policy E-36.4 necessary to deny dental
    prosthetics for extracted tooth. Same for COVID policy that
    unduely delayed dental treatment.
Defendant #9: Dr. Owen Murray, D.O., Vice President UTMB-CMHC (Executive
    Clinical Services / Medical Director) 301 University Blvd.,
    Galeveston, TX  77555-1206

Harmful Acts:  Developed, approved, recommended, enacted, and enforced
    the unconstitutional CMHC Policy E-36.4 necessary to deny dental
    prosthetics for extracted tooth. Same for COVID policy that
    unduely delayed dental treatment.
Defendant #10: Dr. Monte  Smith, D.O., Cheif Medcial Officer, University
    of Texas Medcial Branch - Correctional Managed Health  Care,
    301 University Blvd., Galveston, TX  77555-1206

Harmful Acts:  Developed, approved, recommended, enacted, and enforced
    the unconstitutional CMHC Policy E-36.4 necessary to deny dental
    prosthetics for extracted tooth.  Same for COVID policy that
    unduely delayed dental treatment.
Defendant #11: Dr. Billy E. Horton ,D.D.S., Dental Director, UTMB-CMHC,
    301 University Blvd., Galveston, TX  77555-1206

Harmful Acts:  Developed, approved, recommended, enacted, and enforced
    the unconstitutional CMHC Policy E-36.4 necessary to deny dental
    prosthetics for extracted tooth.  Same for COVID policy that
    unduely delayed dental treatment.
Defendant #12: Dr. Denise DeShields, M.D., Executive Medical Director,
    Texas Texh University Health Sciences Center - Correctional
    Managed Health Care ,ADDRESS UNKNOWN

Harmful Acts:  Developed ,approved, recommended, enacted, and enforced
    the unconstitutional CMHC Policy E-36.4 necessary to deny dental
    prosthetics for extracted tooth.

3B

Defendant #13: Dr. John Doe, D.D.S., Dental Director of TTUHSC-CMHC
     NAME UNKNOWN, ADDRESS UNKNOWN

Harmful Acts:  Developed, approved, recommended, enacted, and enforced
     the unconstitutional CMHC Policy E 36.4 necessary to deny dental
     prosthetics for extracted tooth.

Defendant #14: Theodore Nasiotis, PA, Provider, UTMB-CMHC Hughes
     Unit, 3201 FM 929, Gatesville, TX  76597

Harmful Acts:  Failed to diagnosis vertigo disorder and, thus, unable
     to prescribe proper treatment; which caused fall that injured
     tooth which had to be extracted.
                              D.D.S.,
Defendant #15: Dr. Kristen A. Hurley, Unit Level Dentist, UTMB-CMHC
     Hughes Unit, 3201 FM 929, Gatesville, TX  76597

Harmful Acts:  Followed unconstitutional COVID policy which led
     to undue delay in dental treatment and caused loss of jaw bone
     and extraction of injured tooth.

Defendant #16: Dr. Randall D. Meyer, D.D.S., Unit Level Dentist,
     UTMB-CMHC Hughes Unit, 3201 FM 929, Gatesville, TX  76597

Harmful Acts:  Followed unconstituional CMHC Policy E-36.4 which
     prevented him from prescibing dental prosthetics for extracted
     tooth.

Defendant #17: Teri  Smith, R.N., C.N.M,
     UTMB-CMHC Hughes Unit, 3201 FM 929, Gatesville, TX  76597

Harmful Acts:  Denied  STEP ONE grievances which enforced the unconst-
itutional CMHC Policy E-36.4 and refused to provide dental
     prosthetic for extracted injured tooth and did nothing about
     undue delay in dental treatment caused by COVID polices.

3C

V.    STATEMENT OF CLAIM:

State here in a short and plain statement the facts of your case, that is, what happened, where did it happen, when did it happen, and who was involved. Describe how <u>each</u> defendant is involved. <u>You need not give any legal arguments or cite any cases or statutes.</u> If you intend to allege a number of related claims, number and set forth each claim in a separate paragraph. Attach extra pages if necessary, but remember the complaint must be stated briefly and concisely.  IF YOU VIOLATE THIS RULE, THE COURT MAY STRIKE YOUR COMPLAINT.

In November of 2020, at the Hughes Unit (TDCJ-CID), Plaintiff Marsh experienced symptoms of "Benign Paroxysmal Positional Vertigo." Rather than diagnose or treat the actual disorder, Defendant Nasiotis simply prescribed Meclizine to relieve the accompanying symptoms. As a result of an episode of that undiagnosed and untreated disorder, Marsh fell and injured his front upper tooth number 9. Defendant Hurley determined that Marsh's tooth number 9 could be repaired; but,    the COVID policies created, approved, and enforced by other Defendants prevented scheduling of the repair until the COVID pandemic was over. Within

VI.    RELIEF:

State briefly exactly what you want the court to do for you.  Make no legal arguments. Cite no cases or statutes.    Damages for medical malpractice, Declaratory Judgment that Defendants actions violated the 8th Amendment, Declaratory Judgment that CMHC Policy E-36.4 violates the 8th Amendment as it ignores substantial risk of serious harm to prisoners future medical/dental health, Injuction to not enforce CMCH Policy E-36.4 in Marsh's circumstances and to stop being deliberately indifferent to Marsh's

VII.    GENERAL BACKGROUND INFORMATION:    serious medcial needs.

A. State, in complete form, all names you have ever used or been known by including any and all aliases.

Kristofer Marsh, Krisopher Marsh (TDCJ commentment name), Kris Marsh

B. List all TDCJ-CID identificaiton numbers you have ever been assigned and all other state or federal prison or FBI numbers ever assigned to you.

TDCJ No. 1107881 / FNI number UNKNOWN

VIII.    SANCTIONS:

A. Have you been sanctioned by any court as a result of any lawsuit you have filed? ____YES  ✓NO

B. If your answer is "yes," give the following information for every lawsuit in which sanctions were imposed. (If more than one, use another piece of paper and answer the same questions.)

1. Court that imposed sanctions (if federal, give the district and division): _____
2. Case number: _____
3. Approximate date sanctions were imposed: _____
4. Have the sanctions been lifted or otherwise satisfied? ____YES ____NO

Rev. 05/15

4

STATEMENT OF CLAIM — INTRODUCTION (continued)

three weeks, tooth number 9 was no longer restorable and Marsh had suffered moderate to severe bone loss in his jaw. Marsh's tooth number 9 had to be extracted. Even Marsh's single missing front tooth creates ongoing substantial risk of serious harm to Marsh's future medical/dental health well known to the dental/medical community, such as other teeth shifting and growing unevenly, additional pain (even headaches), chips and cracks of other teeth, future teeth extraction, advanced tooth decay, weakened teeth, additional bone mass reduction in the jaw, problems with sinuses, difficulty gaining employment, loss of ability to fix problem with dental implant, and eventual difficulty chewing which can lead to loss of cognitive abilities and gastrointestinal problems. Yet, Defendants Burrow, O'Daniel, Perryman, DeAyala, Collier, and Lumpkin approved, enacted, and continued to enforce their Correctional Managed Health Care Committee's unconstitutional blanket policy developed with Defendant's Linthicum, Hirsch, Murray, Smith [I], Horton, DeShields, and Doe's approval and advice, that "established medically necessary criteria for dental prosthetics" and prevented the prescribing of and providing for Texas prisoners, like Marsh, with any type of dental prosthetics (i.e. bridges, implants, dentures) "unless there is a [current] severe medical condition requiring them." The set criteria disregards the substantial risk of serious harm to prisoners future medical/dental health, caused by gaps in their mouth from missing teeth, which today's society would not tolerate. The overall result of that unconstitutional blanket policy is to continue to prevent dentist, such as Defendant Meyer, from making their own independent medical/dental judgment concerning prisoners, like Marsh's, treatment (and providing that treatment). Thus, by explicitly enforcing that policy Defendants Linthicum, Hirsch, and Smith[II], have refused to provide Marsh any independent medical/dental judgment about the proper treatment for his now missing tooth number 9 and continue to deny Marsh any type of dental prosthetic.

## I. BACKGROUND FACTS

1.    In 2001, Plaintiff Kristofer Marsh, was sentenced to a term of LIFE in the TDCJ-CID, meaning there are no guarantees Marsh will ever be released and have the opportunity to obtain medical/dental care of his own choosing.

2.    Marsh, at all times prior to these events, during these events, and after these events has maintained excellent levels of oral hygiene, including always brushing his teeth twice a day and daily flossing, so that, Marsh has never experienced gingivitis or periodontal disease and has never before lost any teeth.

3.    All the defendants have acted, and continue to act, under color of state law at all times relevant of this complaint; including members of the Correctional Managed Health Care Committee ("CMHCC") which is governed by Texas statutes and University of Texas Medical Branch at Galveston ("UTMB") and Texas Tech University Health Services Center ("TTUHSC") employees as they are state run universities. In fact, Defendant Collier (and Defendants Lumpkin, Linthicum, and Hirsch) have contracted with Defendant Murray (and Defendants Smith [I], Horton, Nasiotis, Hurley, Meyer, and Smith[II]) for those Defendants to provide health care services, including dental services, to Texas prisoners, like Marsh, as approved by and at the direction of Defendants Collier, Lumpkin, Linthicum, and Hirsch; so that, at all times Defendants Collier, Lumpkin, Linthicum, and Hirsch may require Defendants Murray, Smith [I], Horton, Nasiotis, Hurley, Meyer, and Smith [II] to take "corrective action" concerning the care and treatment of an individual prisoner, like Marsh's, medical/dental condition. Specifically, the final response to a Step II Grievance is "subject to the approval of" Defendant Linthicum (and Hirsch).

4.    In the past, the Texas Board of Criminal Justice ("TBCJ") Chairman, currently Defendant O'Daniel; TBCJ's Health Care Committee, currently chaired by Defendant Dr.

Rodney Burrow, MD, with Defendant Patrick O'Daniel, Defendant Derrelynn Perryman, and Defendant E.F. "Mano" DeAyala as current members, and the Texas Department of Criminal Justice's ("TDCJ") Executive Director, currently Defendant Bryan Collier and the Director of the TDCJ—Correctional Institutions Division, currently Defendant Bobby Lumpkin; allowed prisoners to receive dental prosthetics when properly diagnosed and ordered as treatment by the prison's dentist.

5.     At some point, in response to State wide budget cuts, cost containment studies/efforts, and further implementation of Texas Correctional Managed Health Care Program to provide efficient and economical use of State resources Defendants Burrow, O'Daniel, Perryman, DeAyala, Collier, and Lumpkin's CMHCC changed the dental prosthetics policy and Defendants Burrow, O'Daniel, Perryman, DeAyala, Collier and Lumpkin approved, enacted, and continue to enforce their unconstitutional blanket ban denying, for non-medical related financial cost reasons, prisoners the opportunity to be prescribed dental prosthetics for missing teeth.

6.     The CMHCC, with the approval of TDCJ's Director of Health Services Division, currently Lannette Linthicum MD; the Medical Directors of UTMB Correctional Managed Health Care (CMHC) program, currently Defendants Owen Murray DO and Monte Smith DO; the Medical Director of TTUHSC-CMHC program, currently Defendant Denise DeShields, MD; the Dental Director of TDCJ Health Services Division, currently Defendant Manuel Hirsch DDS; dental Director of UTMB-CMHC program, currently Defendant Billy Horton, DDS; the Dental Director of TTUHCS-CMHC program, currently Defendant John Doe, DDS; CMHCC's joint committee on Policy and Procedure; and all the members of the CMHCC developed and recommended the Dental Prosthodontic Services Policy (E-36.4) of the Correctional Managed Health Care Policy Manual.

7

7.    CMHC    Policy E-36.4 "establish[ed] medical necessary criteria for dental prosthetics," and limited that criteria to prisoners with fewer than 7 occluding posterior teeth, nutritional deficiencies, in conjunction with Maxillo-facial reconstruction, treatment for tempero-mandibular joint dysfunction, or treatment for extreme gastrointestinal disease. The overall effect of the policy was to remove from individual dentist the ability to make any independent medical and dental judgment as to the proper treatment for an individual prisoner's specific fact scenario (i.e. missing teeth and future medical/dental harm). Indeed, even after a treating dentist determines that a prisoner has a "medically necessary" reason for dental prosthetics, the dentist may only make a recommendation which much be approved by Defendants Burrow, O'Daniel, Perryman, DeAyala, Collier, Lumpkin, Linthicum, Hirsch, Murray, Smith [I], Horton, DeShields, and Doe's Dental Utilization Quality Review Committee ("DUQRC") before Defendants Collier, Lumpkin, Linthicum, Hirsch, Murray, Smith [I], and Horton will allow a treating dentist to actually provide the treatment which in his or her medical/dental judgment is required.

8.    Defendants Burrow, O'Daniel, Perryman, DeAyala, Collier, Lumpkin, Linthicum, and Hirsch approved of, enacted, and continue to enforce their CMHCC's recommended unconstitutional blanket policy E-36.4 and intended that policy to be read as precluding the prescribing of any treatment with dental prosthetics based on a treating dentist's individual medical/dental judgment unless the established limited medically necessary criteria, of requiring a current severe medical condition, is met while knowing and disregarding the consequences of future dental degradation and medical harm for prisoners, situated like Marsh, of such reading.

9.    Marsh was and continues to be incarcerated at the Hughes Unit of the TDCJ-CID, in the legal custody of Defendants Collier and Lumpkin during the events of this complaint.

10.    The Hughes Unit Offender Orientation Pamphlet provided to prisoners upon assignment and arrival to the unit, revised April 23, 2021, includes a Dental Services Orientation (HAS-97 (Rev. 03/2017)) which explained the Defendants unconstitutional blanket policy that bridges and implants are not to be provided to TDCJ prisoners. Defendants Burrow, O'Daniel, Perryman, DeAyala, Collier, Lumpkin, Linthicum, and Hirsch's unconstitutional blanket policy was also confirmed in Defendant Lumpkin's Offender Orientation Handbook (Rev. Feb. 2017) which stated that "Dental services NOT provided include:...bridges...or [ ] dentures (unless there is a severe medical condition requiring them)."

11.    When the COVID-19 pandemic hit the world Defendants Collier, Lumpkin, Linthicum, Hirsch, Murray, Smith [I], and Horton implemented and enforced policies to prevent the spread of the virus within TDCJ prisons, including for dental and medical facilities. The result of the COVID policies was that prisoners could only be seen by a dentist for a dental emergency, mainly the extraction of diseased or injured teeth. Particularly, no filling or repair of damaged teeth was allowed pursuant to the COVID policies.

12.    Prior to the injury to Marsh's tooth number 9 dental offices in the free world had opened back up and were providing services to fill and repair damaged teeth. Nationwide, dentists had made medical judgments that with the proper personal protection equipment, the spread of COVID could be minimized enough to allow for proper dental treatment. Marsh is unaware of any reports that dental treatment provided during that time caused an outbreak, or even one, infection of COVID-19.

13.    However, even after Marsh's injury to tooth number 9, Defendants Collier, Lumpkin, Linthicum, Hirsch, Murray, Smith [I], and Horton continued to enforce their overly restrictive and now unconstitutional COVID policies which prevented Texas prisoners like Marsh from receiving proper dental treatment, except in dental emergencies. These Defendant's COVID

policies refused treatment, or even evaluation for treatment, solely based on the policy rather than a medical/dental judgment concerning a prisoner's specific fact scenario.

## II. FAILURE TO DIAGNOSE DISORDER CAUSED INJURY TO TOOTH

14.   During the month of November 2020, when Marsh would get up from bed or tip his head backward to look up, Marsh experienced false sensations that his person or his surroundings were moving or spinning, accompanied by nausea and loss of balance, normally for less than a minute at a time.

15.   A few days before November 20, 2020, when Marsh woke up in the morning and went to get out of bed he experienced these symptoms, almost fell down, and had to hold onto the wall for support. As part of his morning routine Marsh drank some water and then used the restroom. While sitting on the toilet Marsh continued to feel like he was spinning and had to get up in order to vomit into the toilet.

16.   Marsh submitted a sick call (via I-60 request) to the Hughes Unit Medical Department, which was received by the Medical Department on November 19, 2020, complaining of a possible ear ache.

17.   On November 20, 2020 Marsh was seen in the Medical Department by Sunny J. Ramirez, RN, and Marsh clarified that he had "been having vertigo for about a month."

18.   Because Marsh requested it, Nurse Ramirez evaluated Marsh's ears and determined that while mild redness was noted to the bilat ear canals, the typanic membrane was pearl gray and intact. In short, Marsh did not have an ear infection. Nurse Ramirez noted that if it was not an ear infection Marsh did not know what was causing these new symptoms of vertigo.

10

19.   Nurse Ramirez notified a unit provider, Defendant Nasiotis (Theodore Nasiotis, PA), of Marsh's complaints and evaluation.

20.   Defendant Nasiotis, without personally or through Nurse Ramirez obtaining additional information about Marsh's symptoms or condition, solely prescribed 25 mg. of Meclizine, 3 times daily, to relieve the accompanying symptoms.

21.   Defendant Nasiotis never made a diagnosis of Marsh's condition and, thus, failed to prescribe the correct treatment for "Benign Paroxysmal Positional Vertigo," namely to perform the Epley maneuver which cures and provides immediate relief (without the use of drugs) for 90 to 95% of people with this disorder.

22.   Marsh took the Meclizine as prescribed, but little relief from his symptoms was experienced.

23.   On December 19, 2020 again as Marsh was getting up from bed and preparing for the day, in the restroom area of his assigned living area (19 dorm, Z-pod) Marsh experienced an episode of "Benign Paroxysmal Positional Vertigo" which included the symptoms of a false sensation of spinning.

24.   The resulting loss of balance caused Marsh to fall and hit his face on the restroom sink. Marsh also lost consciousness during this incident. When Marsh hit his face on the sink he busted his mouth (ex. teeth hitting lips and cutting skin which leads to bleeding) and injured his top front teeth.

25.   Security staff initiated an "ICS" where medical officials were called out to the dorm and Marsh was transported to the medical department ER.

26.   At the Hughes unit ER the medical personnel were concerned with Marsh's level of consciousness and Marsh was able to answer their questions. The medical personnel referred Marsh to the dental department to deal with his broken tooth number 9 and chipped adjacent tooth.

27.   Marsh's sick call complaints and step one and step two (# (S) 2021060085 & 2021122752) were all based on his dissatisfaction with the treatment he received (from Defendant Nasiotis) which caused the injury to his now missing tooth number 9. Specifically Marsh asserted that it was the denial of care and medical negligence (i.e. mistakes) for his "Benign Paroxysmal Positional Vertigo" which caused the injury and the loss of his tooth.

28.   It was medical malpractice when Defendant Nasiotis failed to follow the accepted modern professional standards of care to ask Marsh to describe the nature and circumstances of his symptoms and ascertain that the vertigo (and nausea) happen when Marsh got up from bed and changed the position of his head and only lasted for less than a minute at a time, which was necessary for a diagnosis of "Benign Paroxysmal Positional Vertigo"; so that, he failed to even attempt to diagnose Marsh's condition or disorder and was unable to prescribe the proper treatment.

29.   Defendant Nasiotis did not have and use the knowledge, skill, and care ordinarily possessed and employed by a physician assistant of reasonable and ordinary prudence under the same or similar circumstances when he failed to even attempt to diagnose Marsh's condition or disorder and failed to prescribe the proper treatment for "Benign Paroxysmal Positional Vertigo" — which was medical malpractice.

30.   This Federal court has jurisdiction over this State medical malpractice claim pursuant to the court's supplemental jurisdiction as it relates to the same events for which this court has

12

jurisdiction over the federal § 1983 claims. Indeed, it was Nasiotis's medical malpractice which resulted in the injury to Marsh's tooth number 9.

31.    Marsh seeks $10,000.00 in damages from Defendant Nasiotis in his personal capacity for the loss of tooth number 9.

## III. COVID POLICY DELAY IN TREATMENT CAUSED JAWBONE LOSS

32.    As a result of the medical referral for Marsh's chipped tooth, Marsh was seen by Defendant Hurley on December 21, 2020. Marsh reported that his injured tooth was highly sensitive and if he let anything touch it there was great pain. Defendant Hurley identified the injured tooth as tooth number 9.

33.    Defendant Hurley had an x-ray taken of Marsh's tooth number 9 and evaluated that tooth.

34.    Defendant Hurley determined that the x-ray showed no obvious root fractures and "MIDFL half crown fractured off, no obvious pulp exposure, no swelling, no fistula, not tender to palpation, slight tenderness to percussion, no mobility, [and] no obvious periapical radiolucency." Thus, Defendant Hurley concluded that the injured tooth could be restored and ordered that Marsh be scheduled to have his tooth number 9 filled.

35.    Specifically, Defendant Hurley commented to Marsh that she had never seen a tooth she wanted to fix so bad.

36.    Therefore, Marsh refused the alternative offer of extracting tooth number 9 and stated he wanted to try and save tooth number 9.

13

37.   Defendant Hurley informed Marsh that he would not be scheduled for the ordered treatment of filling tooth number 9 until after the other Defendants' COVID restrictions had been lifted.

38.   Marsh informed Defendant Hurley that he had been tested several times for COVID and the results had been negative. Marsh also volunteered to be housed in isolation so that the filling could be performed. Marsh requested that Defendant Hurley find a way to save his tooth now and not wait until after COVID pandemic was over.

39.   Defendant Hurley refused Marsh's request to designate the injury to tooth number 9 an emergency or to take any other action so that Marsh's tooth number 9 could be fixed during the enforcement of the COVID policies. Thus, Defendant Hurley refused to follow her own sound medical/dental judgment to fix the tooth now and disregarded the substantial risk of serious harm to Marsh's future medical/dental health (as described in #43 herein).

40.   Perhaps at the time Defendants Collier, Lumpkin, Linthicum, Hirsch, Murray, Smith [I], and Horton created their COVID policies the balance of health risks from COVID infection and delay in proper dental treatment had not been defined. However, by the time of the injury to Marsh's tooth number 9 in December of 2020 Defendants Collier, Lumpkin, Linthicum, Hirsch, Murray, Smith [I], and Horton were, as was evidenced by the accepted professional standards of care and practices of the dental community at large at the time, aware that there was a substantial risk of serious harm to prisoners future medical/dental health — degradation of an injury such as Marsh's with increasingly serious implications if neglected over sufficient time — which outweighed any health risk from COVID. Thus, at the time of the injury to Marsh's tooth number 9 Defendants Collier, Lumpkin, Linthicum, Hirsch, Murray, Smith [I], and Horton's COVID policies were unconstitutional as they prevented the treating dentist from determining the proper treatment, safety protocols, and timing of treatment

based on their own independent sound medical/dental judgment and specific fact scenario of the prisoner ; so that, the delay in treatment was deliberate indifference to prisoners, like Marsh's, serious medical need.

41.    Yet, Defendants Collier, Lumpkin, Linthicum, Hirsch, Murray, Smith [I], and Horton continued to enforce their now unconstitutional COVID policies which prevented Defendant Hurley from making her own medical/dental judgment of when and what was the proper treatment for Marsh's injured tooth number 9. In fact, Defendant Hurley's personal medical/dental judgment was that the tooth was restorable and needed to be filled right away; so that, Defendants Collier, Lumpkin, Linthicum, Hirsch, Murray, Smith [I], and Horton enforcement of their now unconstitutional COVID policies prevented Defendant Hurley from timely performing that treatment.

42.    It was also Defendant Hurley's personal medical/dental judgment that the fractures in Marsh's tooth number 9 would have become obvious the moment a dental hand piece touched tooth number 9, which is exactly what action the Defendants Collier, Lumpkin, Linthicum, Hirsch, Murray, Smith [I], and Horton's now unconstitutional COVID policies prevented Defendant Hurley from doing.

43.    Defendant Hurley did not disclose to and inform Marsh that if his injured tooth number 9 had non-restorable root fractures which were not showing up on the December 21, 2020 x-ray that significant bone loss to the jaw could result from failing to timely extract the tooth. Nor did Defendant Hurley disclose to and inform Marsh that if he refused the alternative treatment of having tooth number 9 extracted that such bone loss of the jaw at the site of the injured tooth number 9 would create multiple additional future medical risks, including causing it to be difficult to have a dental tooth implant, other teeth shifting and growing unevenly, additional pain (i.e. headaches), chips and cracks in other teeth, speech impediments, advanced tooth

decay, weakened teeth, further bone mass reduction in the jaw, problems with the sinuses, difficulty gaining employment, and eventually difficulty chewing which can lead to a decrease in cognitive abilities and gastrointestinal problems.

44.   Defendant Hurley did not follow accepted, modern, professional standards of care and schedule any follow up appointments to monitor degradation of Marsh's tooth number 9, which she knew or should have anticipated as a dentist of reasonable and ordinary prudence and reasonable intelligence was likely. Such appointments would have either been allowed under the COVID policies (as it related to the possible extraction of the tooth) or Defendant Hurley should have made a personal medical/dental judgment that the risk of future degradation to Marsh's injured tooth number 9 and, as described above in #43, the known attenuated contemporaneous medical harm overrode the risk of the spread of COVID and any possible related health issues.

45.   Had Defendant Hurley attempted to timely restore Marsh's tooth number 9 and non-restorable root fractures had become obvious, then the tooth would have been extracted at that time; so that, the rapid bone loss of 9mm Marsh suffered would have been prevented.

46.   The result of the undue delay in proper treatment was that Marsh suffered moderate to severe jawbone loss at the site of his tooth number 9.

47.   Marsh continued to request Defendant Hurley to designate the injury to his tooth number 9 an emergency so that it could be restored as she had concluded was the proper treatment. One such request was received by the Hughes Unit Dental Department on January 13, 2021. That request once again reported Marsh's negative COVID test taken on January 6, 2021. In response to that request Marsh was told he would be seen when the COVID pandemic was over.                     16

48.    During this time Marsh was in constant pain, where just the slightest touch to his tooth

number 9 was the type of pain that made him stop everything he was doing and just breathe.

Additionally, Marsh could barely eat solid foods and had to obtain liquid drinks and ramen

noodles to sustain him.

49.    Marsh learned, through his Mom's phone conversation with Doctor Sealy (a former

dentist at the Wynn Unit of TDCJ-CID), that his tooth number 9 could be covered with liquid

bonding cement in order to temporarily protect the tooth while awaiting restoration (filling) —

which treatment would have not violated Defendants Collier, Lumpkin, Linthicum, Hirsch,

Smith [I], and Horton's COVID policies.

50.    Eventually, Marsh requested of Defendant Hurley that his tooth number 9 be covered in

liquid bonding cement until a filling could be performed.

51.    Marsh was finally seen again by Defendant Hurley on January 15, 2021. Marsh reported

that he kept reinjuring himself when he ate and brushed his teeth. Marsh also explained that

tooth number 9 was now loose and that it bled around his gums. Not to mention the pain ("It

hurts!") that Marsh reported.

52.    Defendant Hurley had a new x-ray taken of Marsh's tooth number 9 and reevaluated

that tooth.

53.    Defendant Hurley determined that tooth number 9 was fractured into three pieces and

observed "two large pieces of the clinical crown [are] extremely mobile and compressible in

the socket, moderate to severe bone loss, periodontal pockets range from 3-9mm (9mm

pocket on the messial), very tender to percussion, slight tenderness to palpitation, localized

gingival inflammation, …[and] mild bleeding upon probing." Thus, Defendant Hurley

17

concluded that extraction of tooth number 9 was now necessary due to non-restorable crown *clinical*

fractures and non-restorable root fractures.

54.    After Defendant Hurley explained her findings and conclusions to Marsh, he consented

to the extraction of tooth number 9. Defendant Hurley's explanation included that if tooth

number 9 was left in it would have caused additional jawbone loss as the jawbone recedes

away from injuries in the teeth. Marsh's decision to consent to the extraction of tooth number

9 was based largely on that explanation so that he would not suffer additional damage to his

jawbone.

55.    On January 15, 2021 Defendant Hurley did extract Marsh's injured tooth number 9,

which was the only treatment allowed by Defendants Collier, Lumpkin, Linthicum, Hirsch,

Smith [I], and Horton's COVID policies.

56.    Marsh filed his step one grievance (#2021060085) complaining that on December 21,

2020 Defendant Hurley "knew [his] tooth needed to be fixed immediately but she was not

allowed to do so due to COVID restriction...[which] didn't allow the dental dept. to give [him]

proper medical care and the problem worsened." Including that his "jawbone [had] recede[d]

and now there was a risk of future harm, such as, his "teeth shifting to a new position."

57.    Defendant Hurley and Defendant Smith [II] (Terri Smith, RN, CNM) responded that

"COVID-19 did not play a role in tooth number 9 being non-restorable."

58.    Defendant Hurley and Smith [II]'s response also reveal that they were aware of the

excessive risk that when Marsh was first seen on December 21, 2020 there was already non-

restorable root fractures to Marsh's injured tooth number 9, which possibly could only have

been obvious the moment a dental hand piece touched tooth number 9 and that unless

restorative treatment was timely attempted degradation of the injury would destroy the tooth,

eventually resulting in pain, jawbone loss, ' all the other medical/dental harm described in #43 above, and costly treatment to restore or replace the tooth. Yet, Defendants Collier, Lumpkin, Linthicum, Hirsch, Smith [l], and Horton's now unconstitutional COVID policies prevented Defendant Hurley from addressing (or evaluating). that risk because & their policies prevented a dental hand piece from being used to touch injured tooth number 9.

59.    Thereafter, Marsh filed a step two grievance further explaining that if the Hughes Unit Dental Department, Defendant Hurley, "thought there was any risks of cracks forming and going into the…root than I should have been evaluated weekly to catch any jawbone receding." However, because Marsh had to "wait until COVID restrictions were lifted" for the ordered treatment, his jawbone had receded, which also would not have happened had Defendant Hurley attempted to fix his tooth on December 21, 2020. Marsh further explained that the denial of dental care "caused [him] much pain and suffering…and the loss of jawbone." Moreover, because of Marsh's now missing tooth number 9 his "speech ha[d] changed, it [wa] s harder to eat, the jawbone in that area will continue to recede, and the other teeth will move."

60.    TDCJ Health Services Division, Defendant Linthicum (and Hirsch), responded to the step two and concluded that Marsh had "not been denied or delayed dental care…"; so that, no further action was warranted.

61.    Defendant Hurley was negligent, and it was medical malpractice, when she failed to disclose the risks and hazards (i.e. jawbone loss and other future medical/dental harm) that could have influenced a reasonable person, like Marsh, in making a decision to give or withhold consent to immediately extract the injured tooth number 9 on December 21, 2020 even though the tooth appeared at the time to be restorable.

19

62.    Marsh's refusal of the alternative treatment of immediate extraction was without informed consent.

63.    Defendant Hurley was negligent, and it was medical malpractice, when she had a duty to do more to attempt to timely restore Marsh's injured tooth number 9, as under the accepted modern professional standards of care a dentist of reasonable and ordinary prudence, in the same or similar circumstances, who was exercising ordinary care, diligence, and skill in what she undertakes professionally to perform, would have followed her own independent sound medical/dental judgment to timely fill Marsh's tooth number 9, such as declaring the treatment an emergency under the COVID policies. Defendant Hurley's failure to follow those accepted modern standards of care caused the moderate to severe bone loss at the site of Marsh's injured tooth number 9 (and the extraction of tooth number 9).

64.    Defendant Hurley was negligent, and it was medical malpractice, when she had a duty to do more to monitor Marsh's injured tooth number 9 for degradation (appearance of non-restorable fractures and jawbone loss), as under the accepted modern professional standards of care a dentist of reasonable and ordinary prudence, in the same or similar circumstances, who was exercising ordinary care, diligence, and skill in what she undertakes professionally to perform, would have scheduled at least weekly follow-up appointments to take x-rays and examine Marsh's tooth number 9 for fractures and jawbone loss. Defendant Hurley's failure to follow those accepted modern standards of care caused the moderate to severe bone loss at the site of Marsh's injured tooth number 9 (and the extraction of tooth number 9).

65.    Defendant Hurley was negligent, and it was medical malpractice, when she had a duty to do more to prevent further degradation and injury to Marsh's tooth number 9, as under the accepted modern professional standards of care a dentist of reasonable and ordinary

prudence, in the same or similar circumstances, who was exercising ordinary care, diligence, and skill in what she undertakes professionally to perform, would have covered Marsh's tooth number 9 with liquid bonding cement until the COVID policies allowed restoration. Defendant Hurley's failure to follow those accepted modern standards of care caused the moderate to severe bone loss at the site of Marsh's injured tooth number 9 (and the extraction of tooth number 9).

66.    Defendant Hurley was negligent, and it was medical malpractice, when she should have anticipated the dangers (i.e. jawbone loss) that her failure to do more to timely restore, monitor for degradation, and prevent degradation (all as described above) was the type of danger (i.e. jawbone loss) a dentist of ordinary intelligence should have anticipated.

67.    This Federal court has jurisdiction over this State medical malpractice claim pursuant to the court's supplemental jurisdiction as it relates to the same events for which the Court has jurisdiction over the Federal § 1983 claims.

68.    Marsh seeks $10,000.00 in damages from Defendant Hurley in her personal capacity for the loss of tooth number 9 and the bone loss suffered from the delay in treatment.

69.    Defendant Hurley was deliberate indifference to Marsh's serious medical needs when she unduly delayed the treatment she believed was proper in her own personal medical/dental judgment solely because she was following the other Defendants unconstitutional COVID policies rather than their own medical/dental judgment concerning Marsh's specific circumstances and when she assumed the medical soundness of the COVID policies were medically appropriate at the time of the injury to Marsh's tooth number 9. and did not determine herself whether the COVID policies were

21

70.  Defendant Hurley's deliberate indifference to Marsh's serious medical need was a violation of the 8th Amendment to the U.S. Constitution's prohibition against cruel and unusual punishment.

71.  Marsh seeks a Declaratory judgment from this Court that Defendant Hurley's actions violated the 8th Amendment.

72.  Defendants Collier, Lumpkin, Linthicum, Hirsch, Smith [l], and Horton were deliberately indifferent to Marsh's serious medical need when they promulgated, implemented, and continued to enforce their unconstitutional COVID policies which prevented dental treatment except for emergencies (i.e. extractions) which operated in practice to deny and unnecessarily delay treatment which the treating dentist believed in her own sound medical/dental judgment was proper  and could be safely performed with the proper personal protective equipment to minimize the risk of the spread of COVID, and when the Defendants were aware such delay would cause unnecessary suffering as prisoners teeth continued to degenerate, leading to the extraction rather that the restoration of prisoners, like Marsh's, teeth.

73.  Defendants Collier, Lumpkin, Linthicum, Hirsch, Smith [l], and Horton's deliberate indifference to Marsh's serious medical need was a violation of the 8th Amendment to the U.S. Constitution's prohibition against cruel and unusual punishment.

74.  Marsh seeks declaratory judgment from this court that Defendants Collier, Lumpkin, Linthicum, Hirsch, Smith [l], and Horton's actions violated the 8th Amendment.

IV. DENIAL OF DENTAL PROSTHETIC AND FUTURE MEDICAL HARM

22

75.   Due to Marsh's experience of Defendant Hurley not explaining to him the medical risk of waiting to extract his injured tooth and the resultant bone loss, Marsh began to educate himself on the future risk of not replacing his now missing tooth number 9 and leaving the gap in his mouth where the tooth used to be.

76.   Marsh gathered information from Medical textbooks, Harris County Library, and internet articles, which included information from dentists and other dental experts.

77.   Thus, Marsh learned that the substantial risk of serious harm to one's future medical/dental health included other teeth shifting and growing unevenly, additional pain (even headaches), chips and cracks of other teeth, future teeth extraction, advanced tooth decay, weakened teeth, additional bone mass reduction in the jaw, problems with sinuses, difficulty gaining employment, loss of ability to fix problem with dental implant, and eventual difficulty chewing which can lead to loss of cognitive abilities and gastrointestinal problems.

78.   Defendants Burrow, Linthicum, Hirsch, Smith [II], Meyer, Murray, Smith [I], Horton, DeShields, and Doe were by the nature of their medical/dental training fully aware of the substantial risk of serious harm to one's future medical/dental health when a gap is left in one's mouth when even one injured tooth is extracted; and, these Defendants fully explained those substantial risks to Defendants Burrow, O'Daniel, Perryman, DeAyala, Collier, and Lumpkin when the CMHCC recommended they approve, enact, and continue to enforce the unconstitutional policy E-36.4 which created a blanket denial of providing any type of dental prosthetic to prevent or mitigate against those substantial risks, even when a treating dentist believed in their own independent sound medical/dental judgment that a dental prosthetic was the proper treatment. The Defendants also were aware of the substantial risk of serious harm because of prior litigation by other prisoners who were denied necessary dental prosthetics.

23

79.    Yet, Defendants O'Daniel, Burrow, Perryman, DeAyala, Collier, and Lumpkin being aware of those facts which the inference could be drawn that a substantial risk of a serious harm existed to prisoners future medical/dental health and after drawing the inference that policy E-36.4 created that substantial risk to serious harm, the Defendants consciously and recklessly disregarded that excessive risk to inmate health and, with the advice and recommendation of Defendants Linthicum, Hirsch, Murray, Smith [I], Horton, DeShields, and Doe, approved of, enacted, and continue to enforce CMHC policy E-36.4.

80.    Defendants O'Daniel, Burrow, Perryman, DeAyala, Collier, and Lumpkin choose to disregard the substantial risk of serious harm that the unconstitutional CMHC policy E-36.4 would pose to prisoner's future medical/dental health based on non-medical financial cost reasons. In short, these Defendants did a cost/benefit analysis and determined that the financial costs was too great to provide dental prosthetics every time a treating dentist believed it was the proper treatment and, in order to cut those financial costs, the Defendants would await individual litigation and court Orders to provide the necessary dental prosthetics.

81.    When Marsh learned of the substantial risks of serious harm to his future medical/dental health of not replacing his missing tooth number 9 with some type of dental prosthetic he submitted another sick call (via I-60) to the Hughes Unit Dental Department. The Hughes Unit Dental Department received that sick call on June 1, 2021. In that sick call Marsh requested to be evaluated by a dentist for receiving a dental prosthetics to replace his missing tooth number 9 and that failing to prescribe some type of treatment would result in his "now straight teeth to become unstable and impossible to repair."

82.    Marsh was seen by Defendant Meyer (Randall D. Meyer, D.D.S.) on June 3, 2021. Defendant Meyer had another x-ray taken of the gap where Marsh's tooth number 9 used to be and confirmed that it had been fully extracted.

24

83.   Pursuant to CMHC policy E-36.4, Defendant Meyer concluded that Marsh "did not qualify for a medically necessary prosthetic..." and refused to refer Marsh to the DUQRC to be considered for a dental prosthetic.

84.   Specifically Defendant Meyer told Marsh, "He had never seen such a request filled while working in TDCJ and that he had no authority to do so."

85.   Therefore, policy E-36.4 created, approved, and enforced by Defendants Burrow, O'Daniel, Perryman, DeAyala, Collier, Lumpkin, Linthicum, Hirsch, Murray, Smith [I], Horton, DeShields, and Doe prevented Defendant Meyer from making his own independent medical/dental judgment about whether in Marsh's specific factual circumstance some type of dental prosthesis was the proper treatment.

86.   Defendant Meyer did not prescribe any type of dental prosthesis as the proper treatment for Marsh's now missing tooth number 9 nor did Defendant Meyer refer Marsh's case to the DUQRC for them to evaluate the proper treatment.

87.   Because the unconstitutional policy E-36.4 was meant to be read as a blanket policy to never provide prisoners with either bridges or dental implants, Defendant Meyer was prevented from making his own independent medical/dental judgment whether a composite bridge or dental implant was the only and most efficacious treatment for Marsh's missing tooth, as they were medically necessary to prevent substantial risk of serious harm caused by jawbone loss that still happens with other dental prosthetics like dentures.

88.   Even with the only and most efficacious treatment that was medically necessary to prevent the substantial risk of serious harm caused by jawbone loss being a composite bridge or dental implant, because policy E-36.4 was meant to be read as requiring a current severe medical condition in order for a dental prosthetic to be prescribed and provided,

25

Defendant Meyer was prevented from prescribing a partial denture which could potentially have temporarily mitigated against the substantial risk of serious harm to Marsh's future medical/dental health.

89.   Marsh filed a Step one grievance (#2021122752) complaining that without some type of dental prosthesis to replace his now missing tooth number 9 that there was a risk of "damage to other teeth alignment and [additional] bone loss." Marsh explained that "simply ignoring the problem will cause irreparable or astronomically expensive damage."

90.   Defendant Meyer and Defendant Smith [II] responded that, as above, Marsh "d[id] not qualify for a medically necessary prosthetic to replace that front tooth."

91.   Marsh filed a Step two grievance explaining that it should be medically necessary to replace his now missing tooth number 9 because of the risk of "other teeth [ ] migrat[ing] and bone to be lost." Marsh explained how those risks were well known from and by medical texts and dental experts.

92.   TDCJ Health Services Division, Defendant Linthicum (and Hirsch), responded to the step two that a dental prosthetics was denied pursuant to CMHC policy E-36.4. Thus, at the least, Defendants Linthicum, Hirsch, Smith [II] explicitly enforced unconstitutional policy E-36.4 to deny Marsh the opportunity to have a dentist make an independent medical/dental judgment about whether the proper treatment for Marsh's now missing tooth number 9 was some type of dental prosthetic and to refuse Marsh the opportunity to get a dental prosthetic. In short, Defendants Linthicum, Hirsch, and Smith [II] enforced the unconstitutional policy E-36.4 so as to deny Marsh any type of prosthetic and personally rendered a decision that aggrieved Marsh.

93.   CMHC policy A-12.1 confirms that when Marsh's Step Two was signed by, or stamped

by, "Step II Health Services Division" that the response was " subject to the approval of the

Division Director of Health Services" who is Defendant Linthicum and Hirsch. Moreover, by

statute and contract with Defendants Murray, Smith [I], Horton, Smith [II], and Meyer,

Defendants Collier, Lumpkin, Linthicum, and Hirsch retained the authority to direct Marsh's

dental care and require Defendants Murray, Smith [I], Horton, Smith [II], and Meyer to take

corrective action regarding Marsh's dental care. Defendant Linthicum had a statutory

duty to enfore CMHC Policy E-36.4.

94.   Due to the ongoing refusal to provide any type of dental prosthetic Marsh continues to

experience pain when he bites his lip as he eats food, and his other teeth have begun to shift,

additional bone loss has occurred at the site of the gap due to missing tooth number 9. Marsh

also experiences pain when food presses up against the gums in the gap created by the

missing tooth and has had changes in his speech.   This impacts Marsh's daily activties

95.   If left untreated, and without the proper dental prosthetic, the gap in Marsh's mouth

caused by the extraction of his injured tooth number 9, creates a progressive disease

process that is likely to produce agony and to require more invasive, painful, and costly

treatments, including degradation of Marsh's other teeth to the point of requiring extraction of

other teeth (which only furthers the cascade of events that causes additional substantial risks

of serious harm to Marsh's future medical/dental health).

96.   The dental pain described herein accompanied at various degrees of attenuated and

contemporaneous medical harm was and is the unnecessary and wanton infliction of pain

and suffering which does not serve any penological purpose or legitimate penological

objective.

27

97.    The failure to provide Marsh, who has a LIFE sentence, any type of dental prosthetic would result in the permanent denial of medical/dental treatment related to his now missing tooth number 9 resulting in permanent damage and would render his condition irreparable; so that he would die a painful death at the hands of the Defendants, while surely or very likely to experience malnutrition (serious illness) and cognitive problems (needless suffering).

98.    Pursuant to the contemporary evolving civilized standards of dignity, decency, and humanity, society at large would consider the substantial risk to Marsh's future medical/dental health to be so grave that today's society would not tolerate exposing Marsh unwillingly to such a risk.

99.    Defendant Meyer was deliberately indifferent to Marsh's serious medical need when he refused to actually evaluate Marsh for and prescribe a dental prosthetic for Marsh's now missing tooth number 9 solely because he was following the other Defendants unconstitutional CMHC policy E-36.4 rather than his own medical/dental judgment concerning Marsh's specific circumstances and when he assumed the medical soundness of CMHC E-36.4 and did not determine himself whether that policy was medically appropriate.

100.    Defendant Meyer's deliberate indifference to Marsh's serious medical need was a violation of the 8th Amendment to the U.S. Constitution's prohibition against cruel and unusual punishment.

101.    Marsh seeks a declaratory judgment from this court that Defendant Meyer's action violated the 8th Amendment.

102.    Marsh seeks an injunction requiring Defendant Meyer to stop being deliberately indifferent to Marsh's serious medical need, which means making his own independent medical/dental judgment about the proper treatment which is medically necessary to prevent

28

any substantial risk of serious harm to Marsh's future medical/dental health which could be caused by the jawbone loss at the site of Marsh's now missing tooth number 9.

103. Defendants O'Daniel, Burrow, Perryman, DeAyala, Collier, Lumpkin, Linthicum, Hirsch, Murray, Smith [I], Horton, DeShields, Doe and Smith [II] were deliberately indifferent to Marsh's serious medical needs when they developed, recommended, approved, enacted, and continue to enforce CMHC policy E-36.4 which is an unconstitutional blanket policy that continues to operate in practice to prevent treating dentists from making their own independent medical/dental judgment about the proper treatment for gaps in prisoners' mouths, like Marsh's missing tooth number 9, unless there is a current severe medical condition and ignores the substantial risks of serious harm to prisoners, like Marsh, future medical/dental health, and when the Defendants were aware that such blanket denial of treatment for even one missing tooth would cause unnecessary suffering as prisoners' teeth continued to degradation, leading to a substantial risk of serious harm to prisoners, like Marsh, future medical/dental health.

104. Defendants O'Daniel, Burrow, Perryman, DeAyala, Collier, Lumpkin, Linthicum, Hirsch, Smith [I], Horton, DeShields, Doe and Smith [II]'s deliberate indifference to Marsh's serious medical need was a violation of the 8th Amendment to the U.S. Constitution's prohibition against cruel and unusual punishment.

105. Marsh seeks a declaratory judgment from this court that Defendants O'Daniel, Burrow, Perryman, DeAyala, Collier, Lumpkin, Linthicum, Hirsch, Smith [I], Horton, DeShields, Doe and Smith [II]'s violated the 8th Amendment, and that CMHC Policy E-36.4 is unconstituional.

106. Marsh seeks an injunction from this court requiring Defendants O'Daniel, Burrow, Perryman, DeAyala, Collier, Lumpkin, Linthicum, Hirsch, Smith [I], Horton, DeShields, Doe

and Smith [II] to stop being deliberately indifferent to Marsh's serious medical needs, which

means allowing a unit level dentist to make their own independent medical/dental judgment

about the proper treatment for Marsh's now missing tooth number 9 and providing whatever

dental prosthetics the treating dentist determines in their own medical/dental judgment is

medically necessary to prevent any substantial risk of serious harm to Marsh's future

medical/dental health (i.e. which prevents jawbone loss), and, to not enforce

CMHC Policy E-36.4 to prevent the proper treatment for Marsh (as

prescribed by the treating dentist).

30

C. Has any court ever warned or notified you that sanctions could be imposed?    _____ YES  ✓ NO

D. If your answer is "yes," give the following information for every lawsuit in which a warning was issued. (If more than one, use another piece of paper and answer the same questions.)

    1.  Court that issued warning (if federal, give the district and division): _____

    2.  Case number: _____

    3.  Approximate date warning was issued: _____

Executed on: _7-1-22_
        DATE

                                         (Signature of Plaintiff)

## PLAINTIFF'S DECLARATIONS

1.  I declare under penalty of perjury all facts presented in this complaint and attachments thereto are true and correct.
2.  I understand, if I am released or transferred, it is my responsibility to keep the court informed of my current mailing address and failure to do so may result in the dismissal of this lawsuit.
3.  I understand I must exhaust all available administrative remedies prior to filing this lawsuit.
4.  I understand I am prohibited from brining an *in forma pauperis* lawsuit if I have brought three or more civil actions or appeals (from a judgment in a civil action) in a court of the United States while incarcerated or detained in any facility, which lawsuits were dismissed on the ground they were frivolous, malicious, or failed to state a claim upon which relief may be granted, unless I am under imminent danger of serious physical injury.
5.  I understand even if I am allowed to proceed without prepayment of costs, I am responsible for the entire filing fee and costs assessed by the court, which shall be deducted in accordance with the law from my inmate trust account by my custodian until the filing fee is paid.

Signed this _1ST_ day of _July_, 20 _22_.
              (Day)                   (month)       (year)

                                         (Signature of Plaintiff)

**WARNING: Plaintiff is advised any false or deliberately misleading information provided in response to the above questions may result in the imposition of sanctions. The sanctions the court may impose include, but are not limited to, monetary sanctions and the dismissal of this action with prejudice.**

31

Rev. 05/15